54 CCPA

### Application of David Neville KIRK and Vladimir Petrow.
### Patent Appeal No. 7522.

United States Court of Customs and Patent Appeals.
March 16, 1967.

Dissenting Opinions April 10, 1967.

Rich and Smith, JJ., dissented.

Bacon & Thomas, Washington, D. C. (Jesse B. Grove, Jr., Washington, D. C., of counsel), for appellants.

Clarence W. Moore, Washington, D. C. (Jack E. Armore, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, SMITH, and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.*

WORLEY, Chief Judge.

This appeal is from the decision of the Board of Appeals affirming the rejection of claims 11, 25, 26, 28, 29, 39, 41 and 45 in appellants' application [1] entitled "1-Dehydro-6-Methyl Steroid Compounds."

Each claim defines a specific steroid compound, claim 11 relating to a compound of the spirostane series; claims 25, 26, 28, 29 and 45 to compounds of the androstane series; and claims 39 and 41 to compounds of the pregnane series. It is unnecessary to reproduce any claim since the nature of the compounds will become apparent.

The Patent Office rejected all claims for failure of the specification "to comply with 35 U.S.C. §§ 101 and 112." As we view the record, we are concerned with not only the legal adequacy of appellants' disclosure of "how to use" the claimed compounds under 35 U.S.C. § 112,[2] but also the legal adequacy of assertions of usefulness in the original

---

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. Serial No. 796,749, filed March 3, 1959.

2. 35 U.S.C. § 112 reads in pertinent part: The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

specification under 35 U.S.C. § 101.[3] We are particularly concerned with the applicability of the decision of the Supreme Court in Brenner v. Manson, 383 U.S. 519, 86 S.Ct. 1033, 16 L.Ed.2d 69, to the facts here.[4]

The appropriate starting point for disposition of those issues is appellants' specification, which begins with several general statements as to how the claimed compounds are useful:

It is an object of the present invention to provide a process for the conversion of 3-oxo- Δ4-6-methyl and 3-oxo- Δ4:6-6-methyl steroidal derivatives into the corresponding 1-dehydro-derivatives which are a new class of compounds *often possessing high biological activity*.

The present invention provides new 1-dehydro-derivatives of 3-oxo- Δ4:6-6-methyl and certain 3-oxo- Δ4-6-methyl steroids having the formula

(with or without a double bond at the 6:7 position) which 1-dehydro-derivatives are of value *on account of their biological properties* or *as intermediates in the preparation of compounds with useful biological properties* as herein indicated or as is apparent to those skilled in the art.

\* \* \* \* \* \*

The invention also provides the following new steroidal 6-methyl-1:4-

dien-3-ones and 6-methyl-1:4:6-trien-3-ones which are of value *in steroid technology, in the furtherance of steroidal research and in the application of steroidal materials* to veterinary or medical practice, whether as tablets, elixirs, injections, implants, or other types of pharmaceutical preparation well known to those skilled in the art. (Emphasis supplied)

The description continues with lists of specific compounds of the cholestane, spirostane, androstane and pregnane steroid series together with a recital of "uses" for the compounds recited in the lists. Two compounds of the spirostane series are disclosed, one of which, 6-hydroxy - 6 - methyl - 25D - spirosta-1:4-dien-3-one, is the subject of claim 11. They are said to be

\* \* \* of value *as intermediates in the preparation of 6-methylated aromatic steroid hormones* into which intermediates they may be converted by reaction in solution in acetic anhydride with toluene-*p*-sulphonic acid. (Emphasis supplied)

Eighteen compounds of the androstane series are disclosed. The five recited in the claims are

17β - Hydroxy-6:17α - dimethylandrosta-1:4:6-trien-3-one [Claim 45]

17α - Ethynyl - 17β - hydroxy - 6 - methylandrosta - 1:4:6 - trien - 3 - one [Claim 25]

17β - Acetoxy - 4:6α - dimethylandrosta-1:4-dien-3-one [Claim 26]

9α - Fluoro - 11β:17β - dihydroxy - 6α:17α - dimethyl - androsta - 1:4 - dien-3-one [Claim 28]

17β - Hydroxy - 6α - methyl - 17α-(prop-1-ynyl) androsta-1:4-dien-3-one [Claim 29]

---

3. 35 U.S.C. § 101 reads in pertinent part: Whoever invents or discovers any new and *useful* process, machine, manufacture, or *composition of matter*, or any new and useful improvement thereof, may obtain a patent therefor, *subject to the conditions and requirements of this title*. (Emphasis supplied)

4. This appeal was originally argued December 7, 1965, some three months prior to the decision in Brenner v. Manson on March 21, 1966. On November 10, 1966, this court restored the appeal to the calendar for reargument, and requested counsel to file memoranda "on the effect, if any, of Brenner v. Manson \* \* \* on this appeal." Argument on that question was heard December 5, 1966.

They are said to be

> * * * of value *as intermediates in the preparation of 6-methylated aromatic steroidal hormones,* into which they may be converted by reaction in solution in acetic anhydride with toluene-*p*-sulphonic acid, *as intermediates in the preparation of biologically active compounds and in some cases on account of their biological properties.* (Emphasis supplied)

Some sixteen compounds of the pregnane series are disclosed, including the two compounds of claims 39 and 41,

> 6α - Methyl - 16α:17α - *iso*propylidene-dioxy - pregna - 1:4 - diene - 3:20 - dione [Claim 39] and
>
> 20:20 - Bisethylenedioxy - 6α - methyl-pregna-1:4-dien-3-one [Claim 41].

They are alleged to be

> * * * of value *as intermediates in the preparation of compounds with valuable biological properties such as progestational properties or properties associated with the adreno-cortical hormones or as intermediates in the preparation of compounds with useful biological properties.* (Emphasis supplied)

Appellants' arguments are, in the main, two-fold. They first contend that the specification is adequate to comply with § 101 and § 112 because it discloses that the claimed compounds "have present and useful biological activity of the nature known for analogous steroidal compounds," and that "one skilled in the art would know how to use the compounds of the claims to take advantage of their presently-existing biological activity." The second argument is that the specification adequately discloses that the compounds "have use as intermediates in the production of aromatic steroidal hormones and other biologically useful compounds," and that the examiner has admitted one skilled in the art would know how to use the claimed compounds as intermediates for that purpose. The respective arguments present somewhat different considerations, and will be discussed separately.

## I. The Asserted "Therapeutic" or "Biological" Activity

In his final rejection, the examiner stated:

> All the claims are again rejected as lacking adequate utility. The disclosure fails to indicate to one skilled in the art how one is to use the novel compounds of this invention. The therapeutic properties are stated in such general terms i. e., "useful biological properties", that it fails to convey any useful information to one skilled in the art and further fails to state which of the claimed compounds have a therapeutic activity. * * *

In response, appellants submitted argument that the rejection "is not warranted," and also submitted an affidavit of one of the applicants, a Dr. Petrow, which appellants summarized in a letter accompanying the affidavit and substantially reiterate in their brief here:

> Attached hereto is an affirmation of Vladimir Petrow which shows that one skilled in the art would be able to determine the biological uses of the claimed compounds by routine tests. The Petrow affirmation specifically shows that * * * [the steroid of] (Claim 25) in the well-known McPhail modification of the Clauberg Assay possesses progestational activity on oral administration. The natural hormone, progesterone, on the other hand shows no response on oral administration in the same test. Accordingly, it is quite evident that the compound of claim 25 is a valuable oral progestational agent. This affirmation, accordingly, is proof of the fact that one skilled in the art would have no difficulty in determining whether *or not* the 1-dehydro derivatives of the pregnane series, as claimed, have value biologically as progestational agents. (Emphasis supplied)
>
> In addition, the Petrow affirmation * * * discloses the determination of the anabolic activity of * * * the compound of claim 26. It is shown

by standard test procedure that this compound does have anabolic activity and that, in addition, it has a much higher anabolic/androgenic ratio than that of testosterone propionate, a well-known anabolic agent. * * *

Further * * * the oral progestational activity of * * * the compound of claim 39, is set forth by virtue of *well-known test procedure*. This pregnane derivative is shown to be approximately 4 times as active progestationally on oral administration as * * a well-known oral progestational agent. * * * by means of other tests the compound of claim 39 has been found to have valuable anti-inflammatory activity greater than that of either cortisone acetate or hydrocortisone. By virtue of a further standard test procedure the gluco corticoid activity of the compound of claim 39 has been shown to be more than 10 times that of cortisone and hydrocortisone acetates.

The affirmation of Dr. Petrow not only shows that the compounds claimed do have biological activity as asserted in the specification, but that the nature of such biological activity can be readily determined by those skilled in the art by reason of standard test procedures.[5]

Appellants' affidavit and argument went for naught, the examiner responding that

* * * the final rejection of all the claims in the case as lacking an adequate disclosure of utility is deemed sound and adhered to. * * *

In his Answer before the board, the examiner rejected the claims

* * * as failing to comply with 35 U.S.C. 101 and 112 in that the specification fails to teach those skilled in the art how to use the invention. * * *

After reviewing the various passages of appellants' specification relating to the uses of the claimed compounds and "how to use" them, he concluded:

* * * nowhere is there found a *specific* allegation of utility for any compound within the scope of the claims. Thus the specification does not describe the manner in such full, clear, concise and exact terms as to enable one skilled in the steroid art to use the compounds of the instant invention. * * * Appellants have not listed one specific use for their claimed steroids and as those skilled in the art know steroids are susceptible to hundreds of uses. *What appellants are really saying to those in the art is take these steroids, experiment, and find what use they do have as medicines.* (Emphasis supplied)

With regard to the Petrow affidavit, the examiner stated:

* * * it may be that oral progestational activity can be determined by procedures well known in the art. * * * Once one knows that a compound does have utility as a progestational agent, it is of course merely routine to determine at what doses this activity exists. In other words, if in the specification as filed there had been a specific allegation that the compounds herein claimed had progestational activity this would have been sufficient to satisfy 35 U.S.C. 112, since those skilled in the art would know how to use a steroid possessing progestational activity. Thus, the aforementioned affidavit is not determinative of the issue at bar which is if the specification as filed does not allege a specific utility would one skilled in the art know how to use the invention?

The board agreed, adding that the reference in the specification to "biological properties" of the claimed compounds "is so general and vague as to be meaningless." It found in the specification no reason to expect that any of the claimed compounds "presents the probability of

5. The record shows that the "standard test procedures" involved the use of laboratory animals, specifically rats and rabbits.

usefulness in the same manner as a natural hormone."

Appellants rely on the allegations in their specification that the disclosed compounds have "biological activity" as adequate disclosure of a use for the claimed compounds, stating:

> The disclosure teaches that the novel compounds are, in some cases, of value because of their presently existing biological activity. The application * * teaches that such *steroidal* materials may be applied to veterinary or medical practice in the form of tablets, elixirs, injections, implants or other pharmaceutical preparations. In other words, the compounds in · question are to be used *in the manner of other steroid hormones* in veterinary or medical compositions.

They also rely on the Petrow affidavit as evidence of the proposition that one skilled in the art would know how to use the claimed compounds, and assert that "the Board erroneously, completely ignored the Petrow affirmation confirming. present useful hormonal activity of some of the compounds * * *."

We are not persuaded by appellants' arguments that their specification meets the requirements of §§ 101 and 112. It seems to us that the nebulous expressions "biological activity" or "biological properties" appearing in the specification convey no more explicit indication of the usefulness of the compounds and how to use them than did the equally obscure expression "useful for 'technical and pharmaceutical purposes'" unsuccessfully relied upon by the appellant in In re Diedrich, 318 F.2d 946, 50 CCPA 1355.[6]

Nor does the Petrow affidavit help appellants' cause here. While that affidavit may show that three of appellants' claimed compounds do *in fact* possess specific anabolic, anti-inflammatory or glucocorticoid activity or usefulness as oral progestational agents, that is not the issue before us. It is what the compounds are *disclosed* to do that is determinative here. In that regard, it is appropriate to note that the specification does not even intimate that the claimed compounds of the spirostane and pregnane series *themselves* have "biological activity," much less the specific progestational, glucocorticoid or anti-inflammatory activities mentioned in the affidavit. With respect to the eighteen androstanes that are disclosed, five of which are claimed here, it is said they "are of value * * * *in some cases* on account of their biological properties." (Emphasis supplied.) There is no suggestion *which* androstanes are of value for that reason, or *what* biological properties make them useful.[7]

Thus we agree with the solicitor that appellants' affidavit is simply an *ex post facto* affirmation irrelevant to the issue of adequacy of the original disclosure inasmuch as it attempts to add statements of usefulness to the disclosure

---

**6.** There this court affirmed the rejection of certain claims for failure of an application to comply with section 112, noting that it had no "*specific* disclosure as to just *how* the compounds are to be *used.*"

**7.** Appellants also rely on this court's decisions in In re Hitchings, 342 F.2d 80, 52 CCPA 1141; In re Dodson, 292 F.2d 943, 48 CCPA 1125; In re Krimmel, 292 F.2d 948, 48 CCPA 1116; and In re Bergel, 292 F.2d 955, 48 CCPA 1102, for the proposition that usefulness of compositions of matter under § 101 may be established by an appropriate demonstration that the composition has useful properties or activities when tested in laboratory animals. Appellants correctly point out that the Supreme Court in Brenner

v. Manson neither approved nor disapproved the reasoning and conclusions of those cases, 383 U.S. 531, 86 S.Ct. 1033. However, appellants' reliance on those cases here appears misplaced. In those cases, the inventors had carried their invention substantially further than appellants here, pharmacological testing having proceeded to an extent that some particular salutary effects on conditions inimical to animals could be ascribed to the compounds in issue there. The general results of those tests were disclosed in the application as filed, in contrast to the situation here. See also Archer v. Papa, 265 F.2d 954, 46 CCPA 835, 121 USPQ 413; Blicke v. Treves, 241 F.2d 718, 44 CCPA 753.

of the application as filed. Indeed, the sum and substance of the affidavit appears to be that one of ordinary skill in the art would know "how to use" the compounds to find out in the first instance whether the compounds *are—or are not—in fact* useful or possess useful properties, and to ascertain what those properties are. It amounts to an admission that experimentation would be necessary to determine actual uses—or possible lack of uses—of the compounds, as well as how to employ them in a useful manner. But surely Congress intended § 112 to presuppose *full satisfaction* of the requirements of § 101. Necessarily, compliance with § 112 requires a description of how to use presently useful inventions, otherwise an applicant would anomalously be required to teach how to use a useless invention. As this court stated in *Diedrich,* quoting with approval from the decision of the board:

> We do not believe that it was the intention of the statutes to require the Patent Office, the courts, or the public to play the sort of guessing game that might be involved if an applicant could satisfy the requirements of the statutes by indicating the usefulness of a claimed compound in terms of possible use so general as to be meaningless and then, after his research or that of his competitors has definitely ascertained an actual use for the compound, adducing evidence intended to show that a particular specific use would have been obvious to men skilled in the particular art to which this use relates.

As the Supreme Court said in Brenner v. Manson:

> * * * a patent is not a hunting license. It is not a reward for the search, but compensation for its successful conclusion. * * *

Appellants further argue that the board had no grounds for concluding there was "no definite expectation from the specification" that any one of the claimed compounds "presents the probability of usefulness in the same manner as a natural hormone." According to appellants, "The analogy to known natural and synthetic hormones [presumably appellants intend to draw an analogy in chemical make-up or constitution between the claimed compounds and, for example, the natural hormone progesterone] enables one to predict that the new compounds would possess similar hormonal activity." Moreover, since some of the disclosed compounds of the pregnane series, not claimed here, were stated in the specification to be of value on account of their hydrocortisone-like anti-inflammatory properties, appellants contend that "it would not be unreasonable to predict that others of this series [i. e. the claimed pregnane derivatives] would also have this property."

■ Similar arguments were advanced before, and rejected by, the Supreme Court in Brenner v. Manson, 383 U.S. at 531–532, 86 S.Ct. 1033. We find no error in the board's position on the facts of this case, absent a disclosure in the specification that the requisite properties of the *claimed* compounds are also similar to those of a natural or synthetic hormone of known activity. Appellants' arguments fail to recognize that many steroid compounds may possess no activity whatsoever. It cannot be presumed that a *steroid* chemical compound is "useful" under § 101, or that one of skill in the art will know "how to use" it, simply because the compound is closely related only in a structural sense to other steriod compounds known to be useful. Cf. In re Adams, 316 F.2d 476, 50 CCPA 1185, dissenting opinion.

■ We conclude that appellants' specification does not comply with § 101 and § 112 merely on the statements of "biological" activity recited therein.

## II. *The Asserted Usefulness as an "Intermediate"*

As can be seen from the portions of the specification quoted earlier, appellants disclose that the claimed spirostane and androstane derivatives may be used as intermediates in the formation of 6-methyl aromatic steroids, and that the claimed pregnane derivatives may similarly be employed to produce steroids hav-

ing "progestational properties" or "properties associated with the adreno-cortical hormones." [8]

The examiner has conceded that "those skilled in the art would know how to produce aromatic steroids" from the claimed compounds. However, he did not believe the inquiry into the adequacy of the disclosure should stop there, noting:

\* \* \* As to the portions of the disclosure which indicates that the claimed compounds are useful as intermediates in the production of 6-methylated aromatic steroids, *applicants have failed to show even one useful aromatic steriod which corresponds to the claimed intermediates. In other words, applicants' statement of utility is to the effect that the novel compounds claimed herein are useful in making other novel compounds which have no known use.* In the Examiner's opinion this is not suffcent nor does the Examiner know of any decision holding that such a statement is adequate. (Emphasis supplied)

Appellants contend that the examiner's holding [9] "is straight into the teeth" of the decision of this court in In re Nelson, 280 F.2d 172, 47 CCPA 1031. They urge that the present disclosure with respect to the usefulness of the claimed compounds as intermediates "is on all fours" with that in *Nelson*. In their view, the examiner's requirement for disclosure of a use of the final products produced by carrying out the known process on the novel intermediates of the claims "is an absurdity" in view of *Nelson* and the further decisions of this court in In re

---

8. The disclosure with respect to the claimed pregnanes was characterized by the board as "even less helpful as to the manner in which these compounds may be used." We note, as did the solicitor, that appellants do not *disclose* either broadly or specifically what steroids having "progestational" or "adreno-cortical" properties may be produced from the claimed pregnanes. There is no hint in the disclosure as to what additional molecular substituents, if any, must be present in the steroids to be produced from the claimed pregnanes to obtain the recited properties. Nor do appellants direct our attention to *any* specific compound, possessing some specific property and known to the art at the time they filed their application, which can be prepared from the claimed pregnanes.

9. It is interesting to compare the rejections voiced by the examiner and board and summarized by the solicitor in *Nelson*, 280 F.2d 172, 176–177, 47 CCPA 1031, 1037–1039, with those raised here. For all intents and purposes, the rejections are identical. Although the board here found no decision "more directly relevant" than *Nelson*, nevertheless the examiner, board and solicitor all seek to distinguish it, urging that this court "evidently felt" that at least some of the products which could be made using Nelson's compounds as intermediates would be final products usable with no experimentation for specific therapeutic end purposes. The court did not intend *Nelson* to have the narrow scope attributed to it by the Patent Office. The most the court knew about what could be done with Nelson's C-19 14-hydroxy androstenes was that they could be used as intermediates to produce "steroids of a class at least some members of which are known to have useful therapeutic properties." The court took that as no guarantee that any of the *particular* "final products" which might be produced from Nelson's *particular* intermediates themselves would have the cardiac glycoside activity of other members of the class. As appellants correctly note in their brief:

> In the *Nelson* case, one skilled in the art could not exactly predict what therapeutic properties the end products produced by the use of the claimed intermediates might have, nor could they predict that they would possess any at all.
> \* \* \*

Appellants, however, also urge that their intermediates are "useful" substances even under the Patent Office interpretation of *Nelson*. They contend that the 6-methyl aromatic steroids produced from their claimed compounds *are* members of a class of aromatic estrogen compounds, some of which are useful commercially. They refer specifically to certain members of that class in their brief. But appellants have not disclosed or otherwise shown that *any* 6-methyl aromatic steroid which can be produced from their intermediates possesses activities in common with those commercial members of the aromatic steroid series. We cannot accept their arguments for reasons given under Part I of this opinion.

Wilke, 314 F.2d 558, 50 CCPA 964, In re Adams; and In re Manson, 333 F.2d 234, 52 CCPA 739. They look upon the latter decisions as carrying forward the principle expressed in *Nelson* that, in their words, "there is no necessity for a specification to teach the use of an end product where such end product is not the invention claimed, but merely the result thereof."

The decision in *Nelson* might well control here—*if* that decision were still a viable precedent. The question remains, however, whether the majority view in *Nelson*—that steriod chemical compounds may be useful under § 101 if they are useful to chemists doing research on steroids and can be used to produce steroids which are members of a general class some members of which are known to have useful thereapeutic properties—can possibly remain the law in view of Brenner v. Manson.

There the Supreme Court, in considering what renders a process useful under § 101, discussed the cases cited by appellants here, stating (all emphasis supplied):

> As is so often the case, however, a simple, everyday word [useful] can be pregnant with ambiguity when applied to the facts of life. That this is so is demonstrated by the *present conflict between the Patent Office and the CCPA* over how the test is to be applied to a chemical process which yields an already known product whose utility *—other than as a possible object of scientific inquiry—*has not yet been evidenced. It was not long ago that agency and court seemed of one mind on the question. In Application of Bremner, 182 F.2d 216, 217, 37 C.C.P.A.

(Pat.) 1032, 1034, the court affirmed rejection by the Patent Office of both process and product claims. It noted that "no use for the products claimed to be developed by the processes had been shown in the specification." It held that "It was never intended that a patent be granted upon a product, or a process producing a product, unless such product be useful." Nor was this new doctrine in the court. See Thomas v. Michael, 166 F.2d 944, 946–947, 35 C.C.P.A. (Pat.) 1036, 1038–1039.

The Patent Office has remained steadfast in this view. The CCPA, however, has moved sharply away from *Bremner*. The trend began in Application of Nelson, 280 F.2d 172, 47 C.C.P.A. (Pat.) 1031. There, the court reversed the Patent Office's rejection of a claim on a process [product] yielding chemical intermediates "useful to chemists doing research on steroids," *despite the absence of evidence that any of the steroids thus ultimately produced were themselves thus ultimately produced were themselves "useful."* The *trend has accelerated,*[10] *culminatin* the present case where the court held it sufficient that a process produces the result intended and is not "detrimental to the public interest." 333 F.2d at 238, 52 C.C.P.A. (Pat.) at 745.

Stripped of the highly technical procedural differences, the basic issue here, as in Brenner v. Manson, is whether the burden resting on an applicant to show that his invention is useful within the requirements of § 101 has been satisfied. While Manson did not disclose any use at all for the steroid compounds produced by his process, the arguments he ad-

---

10. In a footnote to the above comments, the Court added:

Thus, in Application of Wilke, 314 F. 2d 558, 50 C.C.P.A. (Pat.) 964, the court reversed a Patent Office denial of a process claim, holding that 35 U.S.C. § 112 (1964 ed.) was satisfied even though the specification recited only the manner in which the process was to be used and not any use for the products thereby yielded. See also Application of Adams, 316 F.2d 476, 50 C.C.P.A. (Pat.) 1185.

In Application of Szwarc, 319 F.2d 277, 50 C.C.P.A. (Pat.) 1571, the *court acknowledged* that *its view of the law respecting utility of chemical processes had changed since Bremner.* * * * (Emphasis supplied)

vanced as to why those compounds were useful under § 101 correspond in substantial measure to the disclosure of the specification and the arguments relied on here. There can be no doubt that the insubstantial, superficial nature of vague, general disclosures or arguments of "useful in research" or "useful as building blocks of value to the researcher" was recognized, and clearly rejected, by the Supreme Court:

> Whatever weight is attached to the value of encouraging disclosure and of inhibiting secrecy, *we believe a more compelling consideration is that a process patent in the chemical field, which has not been developed and pointed to the degree of specific utility,* creates a monopoly of knowledge which should be granted *only* if clearly commanded by the statute. * * * The basic *quid pro quo* contemplated by the Constitution and the Congress for granting a patent monopoly is the benefit derived by the public from an invention with substantial utility. Unless and until a process is refined and developed to this point—where specific benefit exists in currently available form—there is insufficient justification for permitting an applicant to engross what may prove to be a broad field.

> *These arguments* for and against the patentability of a *process* which either *has no known use* or is *useful only in the sense that it may be an object of scientific research* would *apply equally* to the patenting of the *product produced by the process.* Respondent appears to concede that with respect to a product, as opposed to a process, Congress has struck the balance on the side of nonpatentability unless "utility" is shown. Indeed, the decisions of the CCPA are in accord with the view that a product may not be patented absent a showing of utility greater than any adduced in the present case. *We find absolutely no warrant for the proposition that although Congress intended that no patent be granted on a chemical compound whose sole "utility" consists of its potential role as an object of use-testing,* a different set of rules was meant to apply to the process which yielded the unpatentable product. *That proposition seems to us little more than an attempt to evade the impact of the rules which concededly govern patentability of the product itself.* (Emphasis supplied)

▆▆▆ Wholly aside from the controlling impact of that reasoning here, the conclusion is inescapable that, just as the practical utility of the compound produced by a chemical process "is an essential element" in establishing patentability of the process, 383 U.S. 519, 86 S.Ct. 1033, so the practical utility of the compound, or compounds, produced from a chemical "intermediate," the "'starting material" in such a process, is an essential element in establishing patentability of that intermediate. It seems clear that, if a process for producing a product of only conjectural use is not itself "useful" within § 101, it cannot be said that the starting materials for such a process— i. e., the presently claimed intermediates —are "useful." It is not enough that the specification disclose that the intermediate exists and that it "works," reacts, or can be used to produce some intended product of no known use. Nor is it enough that the product disclosed to be obtained from the intermediate belongs to some class of compounds which now is, or in the future might be, the subject of research to determine some specific use.[11]

---

11. It does not appear that appellants seriously disagree with us on the matter, for in their memorandum on reargument they state:

> C. By analogy between a process for production of a product and an intermediate for producing an end product, such intermediate would not be useful within the meaning of 35 U.S.C. § 101 merely because it can be used to make the intended product, or because the end product belongs to a class of compounds now the subject of serious scientific investigation.

Cf. Reiners v. Mehltretter, 236 F.2d 418, 421, 43 CCPA 1019, 1026, where compounds employed as intermediates to produce other *directly* useful compounds were found to be themselves useful.

It is impossible to reconcile the reasoning and conclusion of the majority in *Nelson, Wilke, Adams* and *Szwarc* with the majority view in Brenner v. Manson. Therefore, to the extent that those decisions are inconsistent with Brenner v. Manson and the views expressed herein, they must be, and are, overruled.

The decision is affirmed.

Affirmed.

RICH, Judge.

*Notice of Forthcoming Dissenting Opinion*

I, like Judge Smith, whose sentiments I share, am now revising a dissenting opinion to cover this case and the companion *Joly* case, 376 F.2d 906, 54 CCPA ——, argued together December 5, 1966, and involving similar issues. I initially filed my tentative dissenting opinion herein February 1 in response to the December 22 majority opinion and a January 24 opinion in *Joly*. Thereafter the majority opinion in *Joly* was 75% rewritten on February 8 and again, on February 20, its content, responsive in part to observations in my dissent, was reduced 50%. In the ensuing three weeks the court has conferred on a long agenda of cases and held a week of hearings March 6–10, upon the conclusion of which I resumed, on March 13, my revision of the dissent. On that day notice was given by the Chief Judge that these two cases "will go down Thursday, March 16."

Protest to the arbitrary use of assumed power having proved futile, this unprecedented display of unseemly haste, condoned by the majority, necessitates this notice.

SMITH, Judge (dissenting).

Our usual practice is to release the majority opinion simultaneously with any dissenting opinions. There has been an unwarranted departure from this procedure in this case, the effect of which is to preclude an expression of my views at this time. I am unable to see wherein the cause of justice is served by such an irregular procedure. This dissent is therefore 1) a protest to the procedure here adopted, and 2) a notice that my full written dissent will be forthcoming as soon as the pressures of court work permit.

WORLEY, Chief Judge (specially concurring).

It is most regrettable that for the first time in the history of this court, the usual orderly processes of the court have been ignored by a minority.

The instant appeal was *re-argued* December 5, 1966. The majority opinion was circulated December 22 in its present form. Yet, now, nearly three months later, the dissenting opinions are not available and no valid excuse is given.

It would seem that if the majority can direct its time and attention to expediting the work of the court it should not be too much to expect the same diligence from the minority.

It should not be necessary to say that the duty of this court is to the litigants, applicants for patents, the Patent Office and the public—not to the possible whims and caprices of individual judges. It is impossible to discharge that duty by condoning the instant derelictions, which hereafter will not be countenanced.

RICH, Judge.

Notice of Withdrawal

With the filing of the attached dissenting opinion in the above case, I hereby withdraw my "Notice of Forthcoming Dissenting Opinion," dated March 16, 1967 (published in Patent, Trademark and Copyright Weekly Reports for April 3, 1967, 153 USPQ No. 1, at page 56 following the majority opinion herein).

RICH, Judge (dissenting).

Contents

| | | Page |
|---|---|---|
| I. | Introduction | 1 |
| II. | *Manson* Is Distinguishable and Should Not Be Extended | 3 |
| III. | *Manson* Did Not Overrule *Nelson* | 7 |
| IV. | Rather Than Starting a "Trend," *Nelson* Was Intended To Stop a Short-Lived Departure from Established Law | 9 |
| V. | This Case and *Manson* Differ by More Than "Highly Technical Procedural Differences" | 16 |
| VI. | There Is a Vast Legislative History on the Meaning of "Useful" | 17 |
| VII. | The Supreme Court in *Manson* Did Not Hold That Disclosure of Use in Research Alone Is Noncompliance with the Statute. It Reserved That Question | 21 |
| VIII. | These Cases Create Unworkable Administrative Problems. If They Stand, the Congress Should Act | 24 |
| IX. | The Majority Decisions Are an Incentive to the Contriving of Phony Utilities, Withholding of Information from Applications, and Delay in Disclosure of New Compounds | 30 |
| X. | The Clash of the Sound and the Unsound Quid Pro Quo Philosophies of the Patent System | 38 |

## I. Introduction

Herein I state my views both on this case and the companion case of In re Joly, 376 F.2d 906, 54 CCPA ——, wherein Judge Smith has written the principal dissenting opinion, with which I generally agree. These cases having been considered together throughout and the majority having decided *Joly* on the basis of its opinion herein, we agreed on this division of labor and the dissenting opinions in each case have had to await developments in the other.

These two cases are something of a sequel to our In re Manson, 333 F.2d 234, 52 CCPA 739, reversed by the Supreme Court in Brenner v. Manson (hereinafter *Manson*), 383 U.S. 519, 86 S.Ct. 1033, March 21, 1966. These cases are Chapter II to *Manson's* Chapter I and involve issues not placed before or argued in the Supreme Court in *Manson*. As I read the *Manson* opinion, after following the cases closely, including attendance at the arguments before the Supreme Court,[1] it is my view that the *Manson* decision is not controlling, is not determinative of the issues here. That was my view when, on July 11, 1966, I circulated an opinion for the court herein which enjoyed majority support for more than three months, during which time no dissenting opinion appeared.[2]

A related key question, to my mind, was then, and still is whether our deci-

---

1. In fact, I have followed the development of this branch of patent law from long prior to the case of Monsanto v. Coe, 79 App.D.C. 155, 145 F.2d 18, (1944), significantly twice referred to by Mr. Justice Fortas in his *Manson* majority opinion.

2. Chief Judge Worley first filed a dissenting opinion herein Oct. 19, 1966, which bears little resemblance to his present majority opinion first circulated Dec. 22, 1966. The first dissenting opinion in *Joly* was also by Chief Judge Worley on Oct. 19 after three separate opinions to *reverse* had been circulated by the late Judge Martin who, however, decided before he died that the "thrust" of *Manson* required affirmance in *Joly*. He never expressly reached *Kirk* to my knowledge.

sion in In re Nelson, 280 F.2d 172, 47 CCPA 1031 (hereinafter *Nelson*), on which appellants principally rely, remains a viable precedent after *Manson*. I think it does and that its overruling herein, together with a somewhat haphazard selection of other cases, is actually inconsistent with the Supreme Court's *action* in deciding *Manson*, notwithstanding some of the *words* in its opinion.

The majority's extension of *Manson* herein and in *Joly* demonstrates to me the need for one or both of two things: (1) further illumination by the Supreme Court, based on arguments directed to the problem, of the law on "utility" with respect to chemical componds, which are *in fact useful* to research chemists in their work and *commercial* in the sense that they are manufactured, sold, and purchased for that purpose; (2) action by Congress to remove the uncertainty and confusion in which these decisions surely leave the law.

To the end that the legal problems may be appraised in the light of practical considerations as well as legal theories, I have set down what follows.

## II. *Manson* Is Distinguishable and Should Not Be Extended

I cannot believe that the purpose of the Supreme Court majority in *Manson* was to decide future issues in patent law unwittingly, by virtue of lower court expansion of its dictum, without knowing the implications of such decisions. Incautious though some of its language may have been, it expressly reserved judgment with the phrase "we express no view" on a group of our cases in which we held new chemical compounds to be "useful," *though having utility only in scientific investigation*. I find those decisions logically indistinguishable from the principles applied by the majority here in the name of *Manson*. (See footnote 17 of *Manson*.)

What the majority makes out of *Manson* by way of a test for utility under 35 U.S.C. § 101 is that the compound must have "practical utility," or "some specific use." This is its summation of what is to be found in the *Manson* passages quoted by the majority. My own summary of that dictum would be that there must be specific, substantial utility which provides specific benefit in currently available form. One reason for characterizing this as dictum is that the opinion also refers to decisions of this court, including *Nelson*, listed in footnote 23 and left undisturbed, which have required "a showing of utility *greater than any adduced in the present case*," (emphasis mine) which, it will be remembered, was zero in *Manson*. The distinction which must be borne in mind is that between *some* disclosure of utility and *none*. The most significant aspect of Manson's patent application and his Rule 204(b) affidavits is that they disclosed *no utility whatever* for the compounds produced by his claimed process.

The issue before the Supreme Court in *Manson* was, primarily, the right of Manson to an interference with an issued patent[3] on a process claim, a subsidiary

---

**3.** That the Supreme Court was well aware of this practical aspect of the case appears from its footnote 12, discussing what the issue was, wherein it said (my emphasis):

> * * * there is no basis for the proposition that even where an *applicant for an interference* [Manson was trying to provoke one with an issued patent] presents a claim which on its face is unpatentable, a *complicated* and frequently *lengthy* factual inquiry into priority of invention must *inexorably* take place.

The policy considerations which operate in priority disputes (interferences) are well indicated in the Government's *Man-*

*son* brief wherein the point was made (p. 31) that:

> * * * the rule below may harmfully operate, as it did in this case, to prefer an inventor who finds no use, and who does not even disclose his invention, over one who, shortly afterwards, independently arrives at both the new process *and* a use for the product produced and seeks a patent after full disclosure to exploit his invention.

What the brief overlooks, however, is that the declaration of the interference is only the beginning and that the policy considerations might well operate to prevent the award of priority to the one with the in-

issue being the sufficiency of the affidavits, containing *no disclosure of utility* for the product of the claimed process, to show a reduction to practice and hence prima facie *priority,* which might deprive the patentees of their patent. The issue here is the legal adequacy of an *admitted disclosure of a use* in an application for a patent on chemical compounds, no issued patent and no question of priority being involved.

While in *Manson* there was no disclosure of a use for the compound, reliance being placed on a mere assertion that utility was obvious to Manson, *here there is admitted disclosure of* utility of the compounds as intermediates to make certain steroids. The Supreme Court in *Manson* did not have this specific issue before it.

If it be said that use as intermediates is utility "only in the sense that it may be an object of scientific research," I note, as did footnote 17 of *Manson,* the cases holding that findings of anti-tumor effectiveness of chemical compounds in mice, rats, and rabbits, i. e., in laboratory animals, objects only of scientific research, constituted statutory usefulness. Since the Supreme Court deliberately left standing these decisions wherein patentability was sustained on the basis of *usefulness only in scientific research,* I cannot possibly read *Manson* as finding *such* utility legally inadequate.

Although the *Manson* opinion makes an argumentative assumption that "Congress intended that no patent be granted on a chemical compound whose sole 'utility' consists of its potential role as an object of use testing," there is no citation of prior decisions or legislative history in support of that assumption, I know of none, that is not the case here, and the statement appears to be inconsistent with the action taken by the Court in *Manson* footnote 17. See Potter v. Tone, 36 App.D.C. 181 (1911), which is an overlooked part of the history of utility law and a case relied on by Chief

Judge Worley in his opinion In re Folkers, 344 F.2d 970, 52 CCPA 1269, hereinafter discussed (section VIII, infra), a case I find indistinguishable from this one but in which he found statutory utility with the unanimous support of the court, which case he has not overruled. The Supreme Court itself, in footnote 23 of *Manson,* acknowledged the *Folkers* case as being one having a showing of utility "greater than any adduced" by *Manson.*

I have searched diligently through the *Manson* opinion's discussion of *process* utility for some authoritative statement of what constitutes usefulness in a *compound,* have found no more than the dictum using the adjectives "substantial," "specific," "currently available," and "practical," and I am forced back on the same inquiry I made in *Nelson* when confronted by the Patent Office with the same words, *usefulness to whom and for what purpose?* I believe, as hereinafter stated, that usefulness, *to* chemists doing research on steroids, *as* intermediates to make other compounds they desire to make is sufficient. I further believe that this is the law as to the meaning of "useful" in 35 U.S.C. § 101 as it was applied for decades and reaffirmed by the 1952 codification of the provision without change and that, for reasons hereinafter stated, it is sound and venerable law conducive to a sound patent system. I do not believe that in settling Manson's claim to an interference the Supreme Court showed any intention of wholly overturning 175 years of established law on what is "useful," especially when it seems not to have found the significant legislative history underlying 35 U.S.C. § 101, which is in history, not in the annals of the legislature.

III. *Manson* Did Not Overrule *Nelson*

It is the majority here, including the two judges who wrote dissenting opinions in *Nelson,* which uses *Manson* as a pretext for unnecessarily overruling *Nelson.*

ferior disclosure, just as they operate so that not all interferences conclude by grant of patent to the first inventor in

fact. See Mason v. Hepburn, 13 App.D.C. 86 (1898); Woofter v. Carlson, 367 F.2d 436, 54 CCPA ——.

Certainly the *Manson* opinion indicates no intent to overrule *Nelson*. In fact, the Supreme Court majority said very little about *Nelson* and what it did say contains errors indicating that the case and its place in legal history were not well understood. The majority opinion here quotes the only passage referring to *Nelson*, taking silent note of one of the errors in it by inserting in brackets the word "product" following reference to "process" for the reason that no process claims were involved in *Nelson*. All the Supreme Court said about *Nelson* was that therein this court moved sharply away from In re Bremner, 182 F.2d 216, 37 CCPA 1032, reversing the "rejection of a claim on a process" (which was not the fact) "yielding chemical intermediates 'useful to chemists doing research on steroids,' despite the absence of evidence that any of the steroids thus ultimately produced were themselves 'useful'." If *Nelson* had involved any process claims, perhaps the *Manson* decision would by implication have overruled a decision on them, but it did not.

The Government's brief in *Manson* likewise had little to say about *Nelson* and deals with the case only in a footnote stating, inter alia, that "Product claims alone were in issue in *Nelson*," and "While not overruling *Bremner*, the court interpreted it as requiring nothing more than was present in *Nelson*." Actually, the *Nelson* opinion, which I wrote, is at some pains to say that the rule of *Bremner* was that an application must contain "an *assertion* of utility and an *indication* of the use or uses intended," that the rule had been fully met in the case, and that we were "not disposed to alter this requirement, which has now been with us for a decade" (280 F.2d at 184, 47 CCPA at 1047). It is not seen how this can be characterized as a move "sharply away from *Bremner*," as the Supreme Court said.

The situation is clear. The dissenting judges in *Nelson* held, and still hold, certain a priori notions about the meaning of "useful" in 35 U.S.C. § 101 and its predecessor statutes back to 1790.

Although these notions are directly contrary to 175 years of legal history, they find dictum in *Manson* conforming to their views. This assumed majority "view" in *Manson* they find requires *Nelson* to be overruled, just as they find *Manson* compels these cases to be affirmed. However, the differences between the facts on which the Supreme Court had to base its decision in *Manson* and the facts it would have to think about if it had these cases or one comparable to *Nelson* before it, are such that the conclusions of the majority here about the controlling effect of *Manson* are legally unsound under elementary principles of stare decisis.

In the next section I hope to clarify where *Nelson* stands in legal history.

IV. Rather Than Starting a "Trend," *Nelson* Was Intended To Stop a Short-Lived Departure from Established Law

*Nelson* did not start a trend, contrary to the statement in *Manson*. It was intended to stop and until now to some extent succeeded in stopping, a very modern trend, started after 1950 *in the Patent Office*. Mr. Justice Harlan appreciated this fact. In *Manson* he said in his dissent, joined by Mr. Justice Douglas, 383 U.S. at 539, 86 S.Ct. at 1044,—and it cannot be too often repeated:

> While available proof is not conclusive [i. e., in the *Manson* record, there being plenty elsewhere in the memories of those living], the commentators seem to be in agreement that until Application of Bremner, 182 F.2d 216, 37 C.C.P.A. (Pat.) 1032, in 1950, chemical patent applications were commonly granted *although no resulting end use was stated* or the statement was in extremely broad terms.[3] Taking this to be true [as it is], *Bremner* represented a deviation from established practice which the CCPA has now sought to remedy in part *only to find that the Patent Office does not want to return to the beaten track. If usefulness was typically regarded as inherent during a long and prolific*

*period of chemical research and development* in this country, surely this is added reason why the Court's result should not be adopted until Congress expressly mandates it, presumably on the basis of empirical data which this Court does not possess. (My emphasis.]

Justice Harlan's footnote 3 cites articles in 41 JPOS 61, 66, 29 Geo.Wash.L.Rev. 87, 91, 53 Geo.L.J. 154, 183 and 14 Am. U.L.Rev. 78 and notes that the *Government's* brief in *Manson* was in accord in saying:

[I]t was apparently assumed by the Patent Office [prior to 1950] * * * that *chemical compounds were necessarily useful* * * * and that specific inquiry beyond the success of the process was therefore unnecessary * * *. [My emphasis.]

A further authority on this subject is Irving Marcus, Manager, General Organic Chemistry Examining Group, Group 120 of the Patent Office, who signed the Examiner's Answers in this case, author of "The Patent Office and Pharmaceutical Invention," 47 JPOS 669, a paper read at the 175th Anniversary Symposium in April 1965. The situation during a period of indefinite extent, but clearly bracketing the passage of the Patent Act of 1952, is thus described by Mr. Marcus (p. 672):

The compound cases were treated in a different manner [from pharmaceutical composition and method of therapeutic use cases]. In spite of disclosures stating merely "useful as pharmaceuticals or in the preparation of pharmaceuticals," [i. e., as "intermediates"] the compounds were allowed as being for useful inventions. There was very little objection to such disclosures and our files are full of patents with these vague disclosures.

It is not the statutes or the decisional law of courts of law which have changed, but Patent Office decisions and *policies*. The only question here, of course, is what are the *statutory* requirements. The present applications of Kirk and Joly are "compound cases" of the type referred to by Mr. Marcus.

A contemporaneous historical news item on the change in Patent Office policy appears in Chemical and Engineering News for December 20, 1954, at p. 5046, where Mr. Stone, Supervisory Examiner for the chemical divisions, is quoted as saying:

Until the Bremner case several years ago, which made it clear that a statement of utility must be included in a chemical patent, *it was almost completely ignored.* Publication of the Tolkmith case last September tightens up this requirement even more by demanding a specific utility. [Emphasis ours.]

Ex parte Tolkmith, 102 USPQ 464 (1954), was a Patent Office Board of Appeals decision involving an application containing an application containing claims to a compound and containing an allegation of use as an intermediate and as a constituent of parasiticide compositions, deemed insufficient under 35 U.S.C. § 112, the board referring vaguely to the requirement for disclosure of "utility" but making no reference to 35 USC 101. The examiner relied on *Bremner*. The board supported his rejection, adding reference to Avakian v. Fahrenbach (unpublished, MS Decisions Vol. 172, 425, 426, Comm'r. 1951).

In an article entitled "Adequacy of Disclosure as Regards Specific Embodiment and Use of Invention," by Wolffe, a member of the *Tolkmith* board, 41 JPOS 61 at 66 (a talk given April 17, 1958) is the statement:

In many cases the manner in which an invention may be used to advantage is so obvious that the specification is not objected to even if it does not describe a particular use. * * *. Numerous patents on alloys which do not specifically describe the particular use to which the alloys may be applied have been granted.

*Until recently* it was also rather common to get patents on *chemical compounds* in cases where *no use* was

indicated for the claimed compounds or in which a *very broad indication* or suggestion *as to use* was included in the application. Two recent decisions, one by the Court of Customs and Patent Appeals [*Bremner*] and one by the Commissioner of Patents [Avakian v. Fahrenbach], have put an end to this practice. [Emphasis mine.]

Wolffe interestingly reports that the examiner in the *Avakian* case took the position that the *Bremner* case did not apply to chemical compounds! (P. 67.) The examiner had said, "Organic compounds are *inherently useful as intermediates* for preparing other compounds and this *inherent utility* satisfies the statutory requirement." (My emphasis.) That is the situation with respect to the administration of the patent law before some unidentifiable upper echelon in the Patent Office turned the thumb screws on the chemists. It did so with no mandate from Congress or the courts. It just arbitrarily decided to change the law.

For the sake of historical accuracy it should be noted that *Bremner* set out no requirement for a minimum quantum of utility and no definite test. All it said was that *a* utility must be asserted and indicated. *Nelson,* moreover, fully accepted *Bremner* (see the section of the opinion entitled "The Bremner Case * * *").

What actually happened in the internal administration of the law by the Patent Office was that, building on what it imagined or wished *Bremner* to say, and a not very definitive ruling in an interference by an Assistant Commissioner in Avakian v. Fahrenbach,[4] the Patent Office began in *Tolkmith* a steady escalation of the requirements for disclosures of "utility," raising them above anything required by the statute or by *Bremner,* and developing its own brand new theories and philosophy about what the statute means by "useful." In the process, as we learned from the *Nelson* record and observed on many other occasions, confusion worse confounded was generated by cross-breeding sections 101 and 112, commingling the requirements for utility, disclosure of how to use, and best mode disclosure, with the result that we tried to lay down some guidelines in *Nelson* to separate these discrete statutory requirements. In our 1958 opinion in that case (not published until later because of rehearing), we first pointed out that in the preceding five years or so the Patent Office had gotten out of line with the century-old course of the patent law.

Nelson's first application was filed in 1951 just when this shift was beginning to take place. The shift was first given general publicity by Commissioner Watson in a portion of an unpublished speech delivered by him in Atlantic City September 19, 1956, to the Division of Medicinal Chemistry of the American Chemical Society, at which time he stated that this then *new* policy, well known to be under criticism, was still being studied "with care." As to the previously obtaining practice he said:

For some time in the past very little attention was paid to the requirement for a disclosure of utility in chemical cases. Some chemical patents were issued with specifications reciting the barest suggestions of uses for the new compounds claimed, or even without uses being stated at all. It was generally the position of the

---

4. This was Commissioner Murphy's supervisory review of an examiner's refusal to dissolve an interference, on motion by Avakian, on the ground Fahrenbach's application was "devoid of any statement as to the utility of the complex chemical compound covered by the count." The same situation existed in *Bremner.* It does not exist here. The Commissioner sent the case back to the examiner with instructions that if a statement of utility could be inserted which would not be "new matter" (which seems a silly idea if in fact there was none) then the interference should proceed, otherwise the examiner should dissolve it. As to its effect on the law, all the case does is to reiterate the *Bremner* rule that there must be "an assertion of utility and an indication of the use or uses intended."

Patent Office that a chemical compound could be regarded as an intermediate substance useful in the preparation of other compounds, since it was regarded as obvious that any organic compound could be so used. Ex parte Watt, 1944 C.D. 5, 63 USPQ 163. And such was also the view of the law taken by the courts. Potter v. Tone, supra. Reviewing that speech makes it appear that what was really concerning the Patent Office, which blurred into other "chemical" cases, was the desirability of full and complete descriptions of the utility and *manner* of using *pharmaceutical preparations* intended for human use as *medicines*. This is a very different problem from the broad question of statutory usefulness.

Historically, I find it insupportable to say that *Nelson* started a "trend." The flare-up of utility rejections during a period of four or five years—but which will now, under the majority decisions, continue indefinitely and with no clear guidelines—was in fact an innovation in a stable interpretation of the word "useful" in the statute which had prevailed for over a century, both in the Patent Office and the courts. *Nelson* reviews this history under the heading "Utility." For an earlier brief review, see "Comparative Utility as a Requisite of Patentability," by C. O. Marshall, 1 JPOS 550, 553 et seq. (1919). It behooves those who would speak with authority on what "useful" means in patent law to consult some of the ample history of the subject and it is hoped that the foregoing puts the place of the *Nelson* opinion in this development in clearer perspective.

As may be imagined, the self-induced change in position on the part of the Patent Office with respect to what the law requires by way of disclosures of utility in chemical applications has contributed heavily to the disproportionate number of appeals in chemical cases. The majority decisions and their inconsistency with other holdings not overruled are not calculated to change that picture.

## V. This Case and *Manson* Differ by More Than "Highly Technical Procedural Differences"

The differences between this case and *Manson* are far from being aptly described—and thus the majority describes them in lawyer's classic brush-off terms —as "highly technical procedural differences." It is naive to assume that the Supreme Court would have decided *this* case as it did *Manson* or would have uttered the same sort of supporting reasoning with respect to it. Different facts call for different decisions which call forth different rationalizations, as anyone knows who has ever written an opinion. The question here is not whether a second and later applicant with *no* disclosure of utility for the product of a process should be allowed to have an interference with a *patentee* who had a *good* disclosure, with the attendant possibility of taking the patent away from him. That was the real issue in *Manson*. The issue here is quite different: whether existing specific *disclosure* of the utilities of new compounds, not yet patented to anyone else, as intermediates to make specific other compounds is a sufficient disclosure to *support* a first patent on an otherwise patentable (i. e., new and unobvious) compound. Utility, of course, is but *one* prerequisite to patentability. This question was not presented in *Manson*. We have no way of knowing how the Court would have decided it.

It is therefore clear, as I understand the principle of stare decisis, that there is no *decision* in *Manson* bearing on the sole issue in this case and it is, therefore, not controlling here. We are free to apply our reasoning to the set of facts before us. The words in *Manson,* on which the majority hangs its rationalization of a result which is but the full flowering of the dissenting opinions in *Nelson*, are not words of authority binding on us. Nor, in my judgment, because of several underlying erroneous factual assumptions, are they even words of wisdom.

I am constrained to align myself with the views expressed by Mr. Justice Harlan to which I refer as expressing views omitted here.

### VI. There Is a Vast Legislative History on the Meaning of "Useful"

Though I am sure the majority think they are being most reasonable, adhering to principles embodied in the Constitution, and following what Congress "must have intended," in point of fact they are legislating and ignoring the law as Congress enacted it.

The Supreme Court in *Manson* found "no specific assistance in the *legislative materials* underlying § 101," which was a 1952 enactment. That is because the legislature was then taking *no action* with respect to that provision except to reenact it without change, wherefore the true "legislative materials" necessarily consist only of its long history of construction and repeated reenactment without change, rather than some revisor's note or testimony at a hearing. It is *history* one must consider, rather than one's inner consciousness and preconceptions.

The ABC's of the situation are as follows: (A) If one goes through the statutes, from the first one in 1790 to date, the simplest of all possible legislative situations is found. Through the course of 162 years of Congressional action (1790–1952), the identical term "useful" has been employed to describe *one* of the prerequisites to patentability. (B) If one then examines the interpretation of this term by the courts and the analyses of the courts' views by the textwriters, what is found is that the case law *always* was that *any* degree of utility to *anybody* was legal "utility." All this is analyzed in *Nelson* in detail. (C) Considering, finally, that the present statute, the Patent Act of 1952, § 101, was enacted without the slightest indication of any intent to change the law, as expressed in the cases, texts, and administrative practice, it is clear that the majority here is indulging in judicial law-making, as the majority in *Manson* would be *if* mere dictum in that opinion is raised to the dignity of "law." I think, in view of the long and clear course of legal history on the construction of "useful," that it would be improper to attribute such an intent to the Supreme Court.

The Patent Office and the majority are wont to mix up sections 101 and 112 on the "utility" issue and to find something more than can be found in 101 in the requirement of 112. The *Nelson* case briefs and record were replete with references to the non-existent "section 112 utility requirement." The argument was, and still seems to be, that the two sections are inseparable and each can be used to wash the other's hands—if you cannot find a requirement for "practical" utility in 101 (and you cannot) then you find it in 112. Judge Kirkpatrick voiced it in dissent in *Nelson* as follows (my emphasis):

> Apparently unwilling to accept a mere statement in the application that the subject matter is useful, Congress *added* Section 112 which, in effect, requires the inventor to tell in his specification exactly *how to make use of* the invention.
>
> \* \* \* \* \* \*
>
> The requirements of Section 112 as to showing manner of using are inseparable from those of Section 101 as to usefulness. The provision of Section 112 that the specification shall describe the manner of using \* \* \* certainly means, in view of Section 101, that the applicant must show how his invention can be employed usefully.

Which is going around in a circle, ending up finally *in* section 101, and *begging the question* as to what is meant by "useful."

Thoughtful analysis will show that the outstanding primary characteristic of the majority opinion is also begging the question on the meaning of "useful," "no known use," "only conjectural use," and "some specific use" without once

explaining what is meant, leaving it to readers to formulate their own meanings according to their own notions. These terms, along with "specific," "currently available," and "practical" use can all be subsumed under the one label—"petitio principii." What the majority *wishes* to be the law applicable to any given fact situation is implicitly taken for granted. History and the case law as reported by every author who ever wrote a textbook provide a sounder working foundation and they are mostly reported in *Nelson*. They are unanimous in finding the law to be that *any degree* of utility, however slight, complies with the requirement that an invention be "useful." The majority has an undefined "quid pro quo" philosophy which simply cannot be squared with legal history.

Any effort to *add to* section 101 through section 112 must fail in any historically justifiable construction of the patent statute for the simple and controlling reasons that: (A) The relevant terms now in section 112 have also been substantially the same ever since they were first introduced into the statute in section 2 of the first Patent Act of 1790 and cast into approximately their present form in the revision act of 1836, section 6. (B) The interpretation of "useful" throughout the ensuing century and a half by the courts as including *any use to anybody*—including usefulness *as* an "intermediate" *to* a research chemist—was notwithstanding the concurrent provisions of section 112 (§ 4888 of the Revised Statutes from 1874 to 1952, which contains the exact phraseology of § 112).

In considering this case-law history one must be alert, in order to escape mental elephant pits, to avoid being confused by opinions which are dealing not with *utility* per se but with the *unobviousness* issue (or its predecessors, the presence of "invention," or "inventive-level" as Stringham calls it) in terms of *degree of* utility as an *indication* thereof. The same precaution is called for in deciding the patentability issue

in current cases so as not to confound the requirement of section 101 with that of section 103. It has been pointed out time and again since the days of Justice Story, as fully discussed in *Nelson*, that *degree* of utility is of no *public* concern whatsoever. This elementary principle appears not to have gotten through to those who still talk of *utility* in terms of "quid pro quo" for a patent. The *only* quid pro quo demanded by statute is *full disclosure* of a new and unobvious invention which is of *some* use to someone. If it is of very little *use*, the patent will correspondingly be of very little *value* to the patentee, who has never been called on either to know or to explain all potential uses of his invention. The hard fact is he almost never knows the full extent of the utility until years after he makes his invention. Uses evolve *after* inventions are disclosed.

VII. The Supreme Court in *Manson* Did Not Hold That Disclosure of Use in Research Alone Is Noncompliance with the Statute. It Reserved That Question

The main thing to be remembered about the *Manson* opinion is that it speaks about a situation in which there was *no* disclosure of utility.

The *Manson* opinion is relatively short, as opinions go. It does not say much. The only point actually decided is that for the purposes of provoking an interference with a process claim in an issued patent an applicant for a patent on the same claim must disclose that the process produces a "useful" product, that it is not enough to assert the use of the product is obvious to the applicant, but some specific use must be mentioned (as *Bremner* said), at least in the absence of evidence that a specific use would be obvious.

Now, in the present cases specific uses for the claimed products *are* asserted. (In *Joly* processes for making the products are also claimed.) This is the first difference from *Manson*. To use the words of *Manson*, there *exists* disclosure of "utility greater than any adduced in the present case," which was

zero. The next hurdle to surmount is the *Manson* reference to "a chemical compound whose sole 'utility' consists of its potential role as *an object of use testing*" and a product of a process which "is useful only in the sense that it may be an *object of scientific research.*" (My emphasis.)

People who look merely at the words of an opinion without regard to what a court *does* in trying to discover "law" are as far from its discovery as religious fundamentalists are from the discovery of "truth" in holy writ in insisting that the world was made in seven (7) days. With respect to what was actually in the collective mind of the Supreme Court majority when it talked of "use testing" and "scientific research"—which is something we can only surmise—the most significant *act* of the Court is manifest in its footnote 17 where it actually came to grips with decisions relating to "use testing" and "scientific research." It there lists four cases (there are really five as there are two companion *Bergel* cases, 292 F.2d 958, 48 CCPA 1101 and 292 F.2d 955, 48 CCPA 1102, both with the same issue, both opinions by Chief Judge Worley) in which the sole utility alleged for chemical compounds was as "an object of use testing," or "an object of scientific research" in *laboratory* animals, as specified in footnote 17. We held such utilities *sufficient* under section 101. As to these the Supreme Court majority was very careful to "express no view." This brings us to the contention of the majority here that the *Manson* decision demands assertion of a "specific" "*practical utility*"—whatever that is. Whatever it is, and neither *Manson* nor the majority give a clue, the contention simply cannot be made to jibe with the *act* of the Supreme Court in withholding judgment on the legal adequacy of disclosure of "scientific" use tests on *laboratory* animals (mice, rats, and rabbits) as a *compliance* with the statutory requirement that an invention be "useful." Useful to whom and for what? In the footnote 17 cases there is only one pos-

sible answer and that is *useful to research workers in their research.* There is nothing "practical" about these uses.

It is clear to me from its *acts* that the Supreme Court majority, regardless of some of its words, pleasing though they may be to the *Nelson* dissenters, deliberately refrained from passing on fact situations such as we have in the instant cases, where there are *specific* disclosures in the specifications of uses to chemists or research workers, namely, use to make other specifically named compounds, coupled with a Patent Office admission of record that *how* to use for that purpose under 35 U.S.C. § 112 is not an issue. Lest they be forgotten, I quote those disclosures, simplified by omission of the involved chemical names which are replaced by the bracketed clauses and retaining the letter designations in parentheses used by the board in its opinion:

(c) [The spirostane series, which includes claim 11] are of value as intermediates in the preparation of 6-methylated aromatic steroid hormones * * *

(d) [The androstanes, claims 25, 26, 28, 29, 45] are of value as intermediates in the preparation of 6-methylated aromatic steroidal hormones, into which they may be converted by reaction in solution in acetic anhydride with toluene-p-sulphonic acid, as intermediates in the preparation of biologically active compounds and in some cases on account of their biological properties.

(e) [The pregnane series, claims 39, 41] are of value as intermediates in the preparation of compounds with valuable biological properties such as progestational properties or properties associated with the adreno-cortical hormones or as intermediates in the preparation of compounds with useful biological properties.

This is a far cry from the total silence on use in *Manson* and it is more than a full compliance with the rule of *Bremner*.

## VIII. These Cases Create Unworkable Administrative Problems. If They Stand, the Congress Should Act

The rule of the majority, with its impossible-to-define criteria, sets up an administratively impossible line-drawing problem. What is "practical" utility? My view, which I believe is clearly in accord with legal history, is that a new steroid, which a research scientist can use at once in his daily work, and which a chemical manufacturer, in accordance with *common commercial* practice, will be happy to sell him without knowing what is to be done with it, has, in *Manson* terms, "currently available," "substantial," "practical" and "specific" utility—to the research scientists as the relevant segment of the public.

I am unable to determine how or where to draw the line between such de facto useful compounds and those involved in In re Folkers, 344 F.2d 970, 52 CCPA 1269 (1965), opinion by Worley, C. J., for one example, wherein this court unanimously accepted as adequate a showing that the compounds were "useful as oxidizing or reducing agents," which is no more than a statement that the compounds are capable of two kinds of basic chemical reactions, and that they were "useful to the biochemist in the study of enzyme systems," which is nothing but "scientific research" or "use testing." The Folkers application, moreover, *did not even state these utilities*. It merely stated *properties* from which the court was willing to infer "some uses." The majority has seen no need to overrule this decision or to find it inconsistent with *Manson*. It has shown no desire to be consistent. If that is to be an indication of where to draw the line, I fail to see how either the inventors or the chemical group Patent Office examiners will be able to follow it. The law should be such, insofar as possible, that the examiners *can* follow it "strictly," as admonished by the Commissioner and by the Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 18, 86 S.Ct. 684, 15 L.Ed.2d 545.

The patent system operated very well —indeed, a lot better and at a lower cost in time and money, with less trouble and fewer appeals—before the Patent Office, not so very long ago, using *Bremner* as an excuse but going far beyond its requirements, initiated its get-tough policy on chemical utility, a policy bringing confusion in its train as the appeals to this court during the past decade well illustrate. From the practical administrative standpoint, the best rule, which is what we had in substance until 1950, is that chemical compounds are per se "useful" within the meaning of 35 U.S.C. § 101. Since that was the rule in effect when Congress reenacted the "useful" and "how to use" provisions in 1952, in the same terms which had been in the statute from the beginning, there is no basis for assuming any "intent" that there should be a different rule.

If this cannot be brought to pass by court decisions, then the problem should be submitted to Congress. An effective statute which would restore the law to what it was for a century and a half would merely have to provide: (a) that new and unobvious chemical compounds are per se useful within the meaning of 35 U.S.C. § 101 and (b) that it shall be conclusively presumed that chemists will know how to use them within the meaning of 35 U.S.C. § 112.

Such restoration of the law, however accomplished, would have the salutary effects of: (1) rendering the law definite, (2) removing a burden from the examining corps it is not equipped to deal with effectively, (3) reducing appeals, (4) speeding up disclosure with consequent facilitation of research, (5) increasing the incentives to produce and disclose new compounds, (6) encouraging the production and marketing of new compounds for experimental purposes which will develop new uses for them, thus advancing the art and advantaging the public, (7) putting an end to the wasting of time and money in concocting uses merely for compliance with Patent

Office requirements, a practice hereinafter exemplified, and (8) stopping the present illegal practice of requiring two inventions to be made before one can be patented—inventions often made by different people working for different employers, one inventing the compound and another discovering the use.

The last point is illustrated by the following from a paper read by Joseph Gray Jackson, distinguished Philadelphia patent lawyer and teacher, at an Institute on Patent Law of the Southwestern Legal Foundation, Dallas, Texas, March 30, 1967. Discussing *Manson* he said (all emphasis mine):

> It thus would seem that utility from the standpoint of aiding the research community is a *highly* undeveloped and *uncertain area in the Patent Law.*
>
> As a practical matter, if you invent a new machine for research, such as an electron microscope, an electron probe analyzer or a chromatograph, it is believed that the Patent Office and the courts will readily accept the idea that it is useful without question as to the utility of the scientific information derived in a particular process or product.
>
> If the invention relates to a process which is useful only in research, the Patent Law requires utility for the product. [Citing *Manson.*] If the invention relates to a new composition whose utility exists solely in research, for example, a new chemical intermediate, there is *grave doubt* whether this is enough utility unless the intermediate is useful to produce products which have themselves known utility.
>
> *If it is to be the law* that a new intermediate for which no known useful end product exists is not to be patentable until such useful end product is developed, in the meantime we will have a strange situation. [Mr. Jackson had not yet learned of these decisions.] The intermediate will be a potential invention held in suspended animation. It is not a patentable invention. The inventor of the intermediate will have to wait until someone produces a useful product from the intermediate. *Then we will have a serious question as to who has made the invention of the intermediate.* If the useful end product is unobvious, it would seem that the inventor of the intermediate will have to join the inventor of the end product with him in order to get a valid patent. On the other hand, if the useful end product is obvious from the knowledge of the intermediate, it would seem that the inventor of the intermediate can get a valid patent as a sole inventor by disclosing the useful end product. *We will also have challenging problems about statutory bars.* Can it be possible that publication or public use of the intermediate more than one year prior to the discovery of any useful end product will create a statutory bar against patenting the intermediate before it is possible to file a valid patent application on the intermediate? It seems to me that you cannot create a statutory bar until one year after it was possible for the inventor of the intermediate to file an application for a valid patent.
>
> An elaborate ritual dance is required to satisfy the Patent Office as to the disclosure of utility of a drug. If the drug is to be applied to humans, the Patent Office usually requires clinical tests, that is, tests on human patients. It is difficult to get the Patent Office to accept proof of utility based on experiments performed on animals alone, unless of course the drug is a veterinary drug, or relates to something like an X-ray opacifier which will foreseeably perform the same way on animals as on humans. The reservation in the *Manson* case of the question as to whether treatment of tumors in mice might be accepted as utility, throws *further doubt* as to how far animal tests will be effective.

In the foregoing we see again how the majority decisions create a situation in which it takes two inventions to get one patent, which may be made by different

people at different times. Mr. Jackson has not even fully developed the problems. If the compound is claimed as the invention, how can the discoverer of its *use* be joined as an inventor, since he did not invent the compound which may have been delivered to him as the invention of a stranger? If it is the *use* that is claimed (as a process, 35 U.S.C. § 100(b)), how can the inventor of the compound be joined, since he did not discover it? There is no "joint" invention in such cases. See 35 U.S.C. § 102(f), which expressly prohibits claiming, or invalidates a patent claiming, that which the applicant or patentee "did not himself invent." Cf. 35 U.S.C. § 282(2).

Thus the rule of the majority, and of *Manson* if read as the majority reads it, plays into the hands of the large to gigantic corporation possessed not only of chemical manufacturing facilities but, in cases involving subject matter such as that here, biological screening and testing facilities—even clinical testing facilities—as well.

The trouble with the majority rule would seem to stem from the fact that the authors of the opinions do not, or do not wish to, see the consequences of their decisions, an example being developed in the next section.

IX. The Majority Decisions Are an Incentive to the Contriving of Phony Utilities, Withholding of Information from Applications, and Delay in Disclosure of New Compounds

When shortly after 1950 the consistent construction of the statutory term "useful" which had prevailed since 1790 began to be upset by the Patent Office—and it was not altered anywhere else that

I know of or anywhere else that any brief has shown—the applicants and potential applicants for chemical compound patents began to ponder the problem of what to do.

I have before me a 6-page single-spaced internal memorandum by one of them, a research chemist in one of the country's largest chemical companies, directed to company patent counsel, dated July 31, 1957, a few months before the *Nelson* case was argued. I know no better way to make clear the mistaken philosophy [5] of the majority and to show how it will work in the commercial world than to extract the following passages (my emphasis):

A well-characterized organic *compound* is something which the chemist, i. e., a person skilled in the art, definitely knows how to use. He can esterify or etherify a hydroxy radical present in a compound, he can amidate or alkylate an amino radical, he knows how to introduce a great variety of substituents into a benzene ring, and he knows enough about typical reactions and typical organic compounds to start with a hitherto unknown compound and proceed through as many as 30 or 50 steps in order to gain a desired end compound. Hence, *to the chemist any new organic compound is a tool which he can use * * *.* Is it necessary that we resort to a utility which can be understood by the non-skilled? * * * Certainly, insofar as the public is concerned, it would be wiser and more appropriate to state simply that the new chemical compound is *useful as an intermediate* for preparing other compounds. In the mechanical art, claims are readily allowed to individual members of machines even though the member in

5. The *Manson* majority opinion ends with a literary flourish in the form of a sentence I wrote in In re Ruschig, 343 F.2d 965, 970, 52 CCPA 1238, 1245, I said, "*a patent system must be related to the world of commerce rather than to the realm of philosophy*"; and that is precisely why I would reverse in these cases. Therefore, as the Supreme Court used the

phrase, my meaning could not have been more completely inverted. It is to the world of commerce and the actual operation of the patent incentive system therein that I have attempted to relate the law in such cases as *Nelson*, our decision in *Manson*, this case and the others so cavalierly overruled by the majority. I shall continue on this course.

itself has no direct utility. A valve is ineffective unless it is connected to a conduit, a rivet in itself serves no purpose without the members which it will unite, and a link is similarly ineffective. * * * Similarly, in chemistry, there may be thousands of compounds which may be regarded as ineffective in themselves but which can be converted by methods as well known to the chemist as is screwing, riveting, and jointing known to the mechanic to give products which constitute *as much of a contribution to the so-called useful arts* as does a finished machine.

So much by way of background. But then we come to the practical problem posed by the rule being promulgated by the majority—a rule of great vagueness and no definite limits by reason of reliance on the terms "practical," "substantial," "specific," and "currently available." They are nothing but trouble-makers, as time will amply demonstrate.

Any chemical compound is also useful as *a material with which research in allied fields is conducted.* New fuels are available *because* new compounds were *available* for testing in fuels. New biological toxicants are serving the public *because* new compounds had been *available* for testing against bacteria, insects and weeds. New plastics and fibrous materials are offered *because* new chemical compounds had been *provided* for testing. The public is well aware of the fact that *the provision of new compounds for testing purposes contributes to national wealth* and it realizes [would that that segment of it on courts did so] that its progress depends upon its capital of new compounds to be tested. Each new compound adds to the public's capital; and in so doing, it becomes *useful.*

We now come to the crux of the matter in the two concluding paragraphs and it will be clear why I cannot identify my source. What these paragraphs describe is already being done on an increasing scale and the majority opinion will have the effect of accelerating it. It is my view that it is *a social evil* and *contrary to sound public policy.* It is one of the inevitable "implications of a decision" like the majority decision here.

In spite of the fact that *research in the allied arts cannot proceed unless there is a constant replenishment of compounds to be tested,* we have somehow failed to consider new *compounds as useful tools* in these arts. At the present time we resort to artificialities in order to justify our provision of these tools to national economy and well-being. In one instance, for example, the writer was faced with preparing a specification on a class of complex compounds having groupings and substituents which a Cancer Institute had thought it would like to test. The compounds had been prepared; *but before sending them out, it was necessary to file patent applications* claiming the compounds *per se.* Biological testing institutions want to know what compound they are using because they wish to relate chemical structure to biological activity. Of course at this stage no utility of any nature [except as tools] had been demonstrated and *since cancer research not only takes a long time but also rarely brings out a direct utility, another utility had to be asserted and demonstrated in the specification.* Since the compounds had carboxylate radicals, it was easy for the chemist to see how they could be converted into compounds of some direct utility. Accordingly, he hydrolyzed one and converted the resulting free acid into a copper salt, being quite certain that the compound containing copper would have a fungicide effect. It did. And the specification was written up setting forth utility of the new compounds as useful intermediates for the preparation of fungicides, the hydrolysis and salt-forming steps were described, and the fungicide tests and results were set forth. This apparently satisfied the utility requirement.

In another instance, a complex compound having a benzene ring was readily sulfonated to give a material which possessed surface-activity, *even though the new compound was so expensive that so far as the chemist knew it would never be expedient to employ it merely as an intermediate for the production of a wetting-out agent.* This again was done simply to satisfy utility requirements.

In view of the fact that *one skilled in the chemical art knows how to convert any new compound into a material which will have the sort of utility that the non-skilled understands,* it is possible, at the expense of valuable time and effort, to demonstrate eventual utility. But, it *undeniably hampers effort* which ought to be directed at a more worthy end; and, what is equally important, *it cheapens the science.*

Clearly it is against public policy to so establish the dynamics of the patent system that they operate to cause scarce scientific and inventive brainpower to waste its time concocting "legal utilities" merely for the purpose of satisfying the Patent Office, which uses are never intended to be pursued further, instead of promoting honest disclosures which simply state that compounds are useful as "intermediates" and are intended merely to be supplied to another research group as the raw materials for further research. Such fantastic "law" is never indulged in with respect to other scientific "tools" of a mechanical or optical or electronic sort, such as a new laboratory balance, electron microscope, oscilloscope, or spectrophotometer, for example, yet they have *no use whatever except to provide information and make research possible.* Nor does the Patent Office worry about the utility of games, toys, and cosmetics. The *rule of the majority is actually an incentive, furthermore, to conceal information* as to the important uses actually in contemplation by the researchers for they dare not even mention such sensitive subjects as *possible* human therapeutic

utility for fear of a demand that they be shown actually to exist and that they be proved by clincial tests beyond the power of the applicant to supply. I have watched this happening for more than a decade.

Least of all am I concerned about the failure of a patent specification to recite "definite" uses of *compounds* at the early stage when little is known about them. This is no cause for practical concern because one thing which surely can be counted on with respect to new compounds, once made available *for* use through the incentive of patent coverage, without any further incentive from the patent system, is rapid dissemination of knowledge about their practical uses. Spreading such knowledge is the vendor's means of creating his market and increasing his profits. Judge Smith gives examples of this in his *Joly* dissenting opinion. There is not the least practical necessity nor statutory obligation, so far as I can determine, for insisting on inclusion in the patent of such use information with respect to newly invented compounds.

Neither am I concerned about the inventor-producer of a new compound enjoying its market for 17 years on an exclusive basis after he has obtained his patent on the basis of some *single,* legally adequate disclosure of a use. He always has and he always will do this, so long as compounds remain patentable. And why should it be otherwise? It is he who gave the world the new compound and thereby produced the progress in the art, thus serving the public. It is rare indeed that all or even the major uses are foreseen.

To cite an analogy from the non-steroid chemical compound field, how could the Teflon-coated frying pan have been developed without Teflon, a material of countless "definite" uses today, mostly not even visualized when Teflon was first produced by du Pont as a material of interesting potentialities. Today it circles the earth in such diverse uses as flexible fuel lines and electrical insulators in missiles and jet engines. Which defin-

ite use is the applicant for patent supposed to wait for and of what real public importance is it that only the first, which is perhaps the least important, be disclosed in the application?

In my view, the Patent Office ruling in this case is an attempt to enforce a short-sighted and impractical policy not required by either the literal terms of the statute or the objectives it is intended to accomplish, a policy never deemed necessary by the Patent Office *under the same statutes* until a very few years ago and applied nowhere except in the chemical examining group, which is something of a discrimination in legal administration.

Relating the matter to the instant case, it is clear from the examiner's Answer on appeal to the board that his gaze was fixed on the prospect that what would be made from the "intermediate" would or must be an ultimate end product with *therapeutic* properties, either shown to be known or determined and disclosed, else nothing would be patentable. That probably started the trouble.

Followed to its logical conclusion, this idea becomes a *reductio ad absurdum*. In the normal course of progress in the useful arts one man's final product is often another man's starting material. The final products of a manufacturer or producer of chemicals may be the biological researcher's raw material and the starting material of the pharmaceutical manufacturer. Is progress in the useful arts to be deemed never achieved until some man beneficially swallows a pill? Why should the patenting of new chemical compounds of *many* potential uses in industry and in medical science await his favorable physiological response? How can anyone do research work on steroids, adding and subtracting substituents, the presence or absence of which the examiner and the solicitor tell us in this case have such profound effects on their physiological properties, and how can they investigate those properties, unless the steroids are first made available?

Who will supply them if they cannot first be protected? Do we wish to restrict protection, as the majority would, to those manufacturing organizations which support their own biological testing facilities? The solicitor's brief herein quotes extensively from a textbook on steroids, "Steroid Drugs," by Norman Applezweig (1962), summarizing as follows:

> It is apparent from the foregoing that steroids, including aromatic steroids, may or may not be biologically active, that even if they possess activity the possible activities are diverse and numerous, and that the activities usually or frequently are drastically affected by the smallest changes in the steroid molecule. Consequently, the broad references in the present application to aromatic steroid harmones [sic] are insufficient to meet the utility requirements of the statute, especially in that such disclosure does not describe how to use the invention in the terms required by 35 U.S.C. 112.

Accepting the first sentence as fact, it argues more against than for the legal consequences of the majority decision.

The *inventions* sought to be patented are *new compounds* and their patentability is not dependent upon specific therapeutic activities, the discovery of which is being left to others, to the biological and medical workers who could not discover their activities without having the compounds supplied to them by the chemical synthesizers. Progress in the chemical arts is made one step at a time and often by different groups of people. One group invents the chemical compounds. Another group discovers their therapeutic uses. Still others may improve upon them by modifications and compounding.

The issue in these cases is of vast practical economic importance to the public, chemical and medical research, and the chemical industry as a whole. The simple question involved, to borrow a phrase from Mr. Justice Douglas,[6] really

---

6. Concurring in The Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 154, 71 S.Ct. 127, 95 L.Ed. 162.

is at what point the inventors of new chemical compounds "serve the ends of science—to push back the frontiers of chemistry." My view, like that of Justices Harlan and Douglas, is that they do it when they are in a position to give the compounds to the world. That is the way they used to be regarded. My observation is that the attempt to regard them otherwise, demanding the second invention before the first can be patented, does nothing but disrupt the smooth operation of our incentive system by delaying disclosure of new compounds and creating untold complications. I can find no good in it.

### X. The Clash of the Sound and the Unsound Quid Pro Quo Philosophies of the Patent System

Ours is a government of laws, not men. The basic law is the Constitution which authorizes, but does not create, a patent system. One of the Article I enumerated powers is that of clause 8 of section 8 granting to Congress the power to secure exclusive rights to inventors in their "discoveries" for limited times. All else is left to Congress.

Congress created a patent system by enacting statutes. The system, clearly, is one of legal rights granted according to terms prescribed by Congress. The right to a patent exists if the applicant complies with the prerequisites. The power of the judiciary is restricted to construing the statutes and applying them to specific facts, as in the case of any other statutes.

The terms fixed by Congress, which should govern the judiciary as firmly as they govern inventors, under a government of laws, are basically five. (1) The invention must fall in the statutory category of 35 U.S.C. § 101. (2) Under the same section it must be new and (3) useful. (4) It must be unobvious as defined in 35 U.S.C. § 103 and (5) it must be clearly disclosed as required in 35 U.S.C. §§ 112 and 113 so as to make the invention available to the public.

An invention which meets the first four requirements is a *patentable* inven-

tion. It is the election of the inventor whether he will patent it or not; there is no compulsion on him to do so and he may keep it to himself. Though patentable, it may or may not be an invention of commercial *value;* patentability, in legal theory, has nothing to do with commercial value. It seems probable that the majority of inventions actually patented turn out to have little or no commercial value. Many, however, have tremendous value. Not every horse places in a race but those which do make the race very attractive. Therein lies the incentive.

How does this legislative scheme serve the Constitutional purpose "to promote the progress of science and useful arts"? The basic proposition to patentees is: *if* your invention has market value and and *if* you can exploit it with profit, that profit will be secured to the extent that you may have the right to exclude others from exploiting *your* invention. Whether that *right* has value is, of course, entirely dependent on whether the *invention* has value. But the right to the patent does not depend on the commercial value of the invention or on whether its contribution to "progress" is large or small or almost nil. The *right* to patent depends on compliance with the conditions specified by Congress and *value* of the invention definitely is not one of them. This is by way of stating the background for consideration of the "quid pro quo" question.

Not far below the surface of the division of opinion in this case lie diametrically opposed views on what is the quid pro quo required of an inventor in exchange for his patent right and the question will never be satisfactorily settled until this problem is clarified. The Latin words have various translations including what for what, something for something, giving one value for another, or in law the mutual consideration.

I prefer not to use the term quid pro quo in discussing patent law because we are dealing with a statutory right and the simple view I espouse is that if the

statutory terms are met, the right must be granted, for what it may be worth. There is nothing in the statutes about quid pro quo. But if one must go looking for one, it is clear enough what it is. A *patentable* invention having been made, in that the first four conditions listed above have been complied with, the *only* quid pro quo required of the inventor is the *disclosure* of his invention required of him as the fifth requirement for patentability.

It is quite possible that what is disclosed either totally lacks or has very little practical or commercial value. But this is how the system operates to promote progress. It produces the dross with the gold. You cannot get cream without producing milk. There is no way to tell ahead of time with any practical degree of accuracy which is going to be which. The gift of prophesy exists neither in the Patent Office nor the courts which review its actions. We had best adhere to administration of the system according to the ground rules laid down by Congress.

Considering quid pro quo, if we must, on this point, it is one of the legal beauties of the system that what is given by the people through their government— the patent right—is valued automatically by what is given by the patentee. His *patent* has value directly related to the value of his *invention*, as determined in the marketplace. In short, notwithstanding the grant of *a patent*, if the inventor has given nothing, the government has given nothing. The right to exclude others from the use of something no one wishes to use is worthless—economically. Nevertheless, in another aspect of the *system* the *disclosure* is there and may serve in its own way to promote progress.

Taking this view of quid pro quo as *disclosure* only, it becomes necessary additionally to state the place of the requirement that the invention be "useful," in the context of these cases, in order to make clear what is wrong with the other concept of quid pro quo. The

unadorned word "useful" has been in the statutes unchanged since 1790. The unwavering course of the courts in construing "useful" since then has been the construction initiated by Justice Story and universally adopted to the effect that any use to anybody for any purpose suffices, without regard to degree. As Rogers on Patents restated it as late as 1914 (Vol. 1, p. 9) "utility * * * approaches a presumption more nearly than any other point recited in the statute and is seldom questioned by the courts or the Patent Office, except in cases of perpetual motion * * *." And in that category this court questions nostrums for growing hair on bald heads, In re Oberweger, 115 F.2d 826, 28 CCPA 749, devices which will not work or are incapable of being comprehended, In re Perrigo, 48 F.2d 965, 18 CCPA 1323, and, for the time being, alleged cancer cures, In re Citron, 325 F.2d 248, 51 CC PA 852. These cases involve the term "useful" in the sense of *operativeness*, not degree of utility. Inoperative compositions and devices have *no* utility.

Any judge or court undertaking today to hold that *degree* of utility is open for consideration *on the issue of compliance with 35 U.S.C. § 101* is simply changing the course of the law as it has been established for over a century and a half. The legislative *history* is clear on that, the identical term bearing the same construction having been enacted time and again until the last reenactment in 1952. It is true there are no legislative *materials* on § 101 for the simple reason there was no discussion of this firmly fixed statute in the course of *codifying* it in 1952. There is no legislative history, therefore, to support a change from the historical construction.

To sum up my view of the law, an invention is patentable when it is in the category named in the statute (here a composition of matter, namely a compound, and in *Joly* a process as well), and it is new, useful (without regard to kind or degree of utility), and unobvious. The quid pro quo for a patent on such an invention, by statutory mandate, is sim-

ply its full disclosure. Now what is the other view? Is it supportable?

Chief Judge Worley articulated his idea about quid pro quo in his dissenting opinion in *Nelson,* in which opinion he used the term and said (my emphasis):

> Patent rights are *valuable* rights and should be *earned* by those who seek patent monopolies. But the net effect of granting a patent here will be to give appellants an *unearned* monopoly on a substantial area in the field of chemistry, and prevent others, unless they are willing to risk infringement, from also *experimenting* in a field which should be open to all.

To dispose quickly of a collateral point of law, experimental use is not infringement.[7] Judge Worley expressed similar sentiments in his dissenting opinions in the instant cases before he was in the majority, which I will not quote from since they are not officially opinions. They resemble his conclusion in the *Nelson* dissent that

> * * * if the majority opinion serves as a precedent, it seems inevitable that in the future the public will be exchanging fixed patent rights for a diminishing *quid pro quo* far below the standards contemplated by the Constitution and the statutes.

I' am unaware of any standard in the Constitution other than the concept that whatever statutory system Congress devised, it should be one which *will* promote progress. Congress devised such a system and the pre-1950 history in the chemical arts indicates that it promoted progress very well indeed, without the majority's affirmation of the Patent Office's innovations in the law.

As to the standards "contemplated" by the statutes, they are explicit. They are set out above. There is nothing in them about "earning" patent rights by producing some particular *degree* of utility.

The only point in the statute at which Congress injected any concept in the nature of *degree* is the *unobviousness* requirement of section 103, a requirement injected into the law by the Supreme Court in 1850. Graham v. John Deere Co., 383 U.S. 1, at 10, 86 S.Ct. 684.

In *Graham* the Court said, 86 S.Ct. at 688,

> Within the limits of the constitutional grant, the Congress may, of course, implement the stated purpose of the Framers by selecting the policy which in its judgment best effectuates the constitutional aim.

That policy is to give patents to those who disclose any new, useful, and unobvious invention in the statutory category. In stating the policy, most recently in 1952, it necessarily used the word "useful" according to the meaning it had acquired in patent law which leaves no room for a *quality* determination by judges as to whether there is enough quid for the quo. As *Graham* has interpreted our present statutes, it is to be *presumed* that the public has derived the benefit contemplated by Congress when the invention disclosed is new, useful, and unobvious. Congress set no further conditions.

It seems to me that the majority's reasoning involves the classic error of thinking that the law requires that *each and every invention* shall promote progress. The statutes contain no such principle. Obviously, whether an individual invention actually promotes progress is a fact determined only by history. Such a test is practically unworkable at the application stage as history cannot be foreseen. Therefore Congress, in its wisdom, laid down *specific* tests for determining patentability and has not imposed on the judiciary or the Patent Office the impossible task of determining *how much* utility "earns" a patent.

---

7. Chesterfield v. United States, 159 F.Supp. 371, 141 Ct.Cl. 838, (Ct.Cls., 1958) and cases cited; Whittemore v. Cutter, 29 Fed.Cas. p. 1120 (No. 17,600) (C.C.D. Mass.1813); Sawin v. Guild, 21 Fed.Cas. p. 554 (No. 12,391) (C.C.D.Mass.1813). See Kaz Mfg. Co. v. Chesebrough-Ponds, Inc., 317 F.2d 679 (C.A.2, 1963).

I appreciate that this is a dissenting opinion but I rest on the hope that there is still some authority in reason and, as Mr. Justice Douglas said in Peak v. United States, 353 U.S. 43, 77 S.Ct. 613, 1 L.Ed.2d 631, that "common sense often makes good law."

SMITH, Judge.

### Notice of Withdrawal

The attached dissenting opinion shall be substituted for my previous dissenting opinion filed March 16, 1967.

SMITH, Judge, (dissenting).

My dissent here and in *Joly*, unavoidably completed after the majority handed down their opinions, I suppose may be termed, in a pragmatic sense as related to any persuasive function here at the court, "Smith's folly." However, because of what seem to me to be the more important considerations, of the injustice done to appellants by the majority and the dire consequences that will flow from the majority decisions, I respectfully submit the following. I am in general agreement with Judge Rich's dissent but desire to add some additional observations.

Appellants here discovered, and attempted to claim, a new and unobvious invention embodied in what the statute terms a "composition of matter." No one argues that they have not succeeded in so doing. However, they are denied a patent because the board and the majority assert they allegedly failed to teach those of ordinary skill in the art how to use the claimed products, section 112, and further, they did not disclose "useful" products, section 101.

The sum and substance of the majority's reasoning seems to be that appellants failed to be as *specific* in their specification concerning what the claimed products were useful for, section 101, as the majority interprets section 101 to require. I base this conclusion on the following observations. The majority agrees appellants stated that their new products possessed high biological activity, had biological properties, were useful as intermediates in the preparation of products having biological properties, were useful in steroid research and were useful in medical or veterinary applications. As intermediates, certain products were said to be of value in the preparation of 6-methylated aromatic steroidal hormones and others were said to possess valuable biological properties such as progestational properties or properties associated with the adrenocortical hormones. The majority further agrees that the evidence proves one skilled in the art would be able to determine biological uses of the claimed products by routine tests.

Appellants attempted to prove the claimed new products were in *fact* useful for the purposes alleged and that persons of ordinary skill in the art would know they were useful and how to use them. Apparently they succeeded in their proofs to the satisfaction of the majority which does not challenge the *facts* established by appellants. However, the majority dismisses these facts as but "an ex post facto affirmation," as "irrelevant," and as representing an attempt to "add statements of usefulness to the disclosure." Further, the majority position is that because appellants submitted these facts, there is an "admission that experimentation would be necessary to determine actual uses," whatever "actual" may mean.[1]

It seems to me that the reasoning of the majority cannot withstand analysis in terms of basic principles of patent law. As I view the majority position, appellants cannot submit *evidence* for consideration that one of ordinary skill in the art would know the claimed products were useful. To the majority, such *evidence* is prohibited as "new matter," see section 132. I agree that "new matter" cannot be added to satisfy any requirement of Title 35. But I fail to see where *evidence* which proves one of ordinary skill in the art would know how to use, section 112, new, unobvious and useful

---

1. See the discussion, infra, of new and unobvious alloys and lubricants.

compositions of matter, section 101, can possibly be "new matter," within any reasonable interpretation of the statute. It seems to me that appellants' *evidence* proves clearly that the examiner and the board members were unable to understand the uses for the products simply because they lacked the knowledge and skills the evidence shows were possessed by those of ordinary skill in this art.

The majority states that "Appellants' arguments fail to recognize that many steroid compounds may possess no activity whatsoever." I find this observation meaningless. Appellants are not so naive. They asserted that they had discovered useful products possessing useful activity. Thus what the majority in effect is saying is that it does not *believe* appellants and for this reason will not consider *evidence* which shows one of ordinary skill in the art, after learning of the claimed products and their asserted uses, would know how to use them as useful products. In determining whether the products are "useful," the majority by its holding restricts appellants to proofs of the knowledge stated in their specification to the exclusion of all information possessed by those of ordinary skill in this art.

The majority, it seems to me, injects confusion into the law and indorses an erroneous standard concerning chemical practice. The usefulness of chemical products is henceforth to be judged by a nebulous, "general versus specific" dichotomy without resort to what one of ordinary skill in the art would in fact conclude as to usefulness. Henceforth, if a disclosure of usefulness is deemed too "general," the inquiry is at an end and appellants are warned not to attempt to confuse the examiner, the board, or this court with *evidence of facts* which prove the invention is useful in the field or for the purposes asserted.

The injustice to appellants in this case is readily apparent. Operating under what they thought the law to be, they filed an application in compliance therewith. Now over eight years later, through the majority's rush to apply the dictum in *Manson* to the *Nelson* dissenters' expressed views as to what the "law ought to be," appellants are criticized for their apparent lack of knowledge in the art of steroid chemistry and are told that their disclosure of usefulness is wholly inadequate. Their application is found by the majority to be deficient ab initio.

*Evidence* of *facts* offered by appellants that one of ordinary skill in the art would find the products useful is characterized by the majority as irrelevant, inadmissible, and an ex post facto affirmation. The stark truth of the matter is that the majority construes a "law" as to chemical utility, "after the occurrence of a fact or commission of an act [filing an application] which retrospectively *changes* the *legal consequences* [patentability] or relations of such fact or deed," Black's Law Dictionary 662 (4th ed.1957) (definition of "ex post facto law,"). Justice demands that appellants be given the opportunity to present the evidence which the majority casually casts aside, presumedly because it is inconsistent with the conclusions they wish to reach.

The majority attempts to justify its holding by statements such as, "the specification does not even intimidate that the claimed compounds of the spirostane and pregnane series *themselves* have 'biological activity'" and "There is no suggestion * * * *what* biological properties make [the androstanes] * * useful." This seems to me to be "fly specking" the specification as to individual products to reach an affirmance. Considering the specification as a whole and in view of the *evidence* submitted by appellants I would find sections 101 and 112 to be satisfied.

I have attempted to explain in my *Joly* dissent why I feel chemical inventors are being wrongfully discriminated against. I believe the majority opinion here is supporting evidence for my views. Considering the simple invention of an admittedly new and unobvious lubricant or alloy, I do not think that the Patent Office or the majority would find either

to be "useless." Yet both the alloy and the lubricant can conceivably be found "useless" under the *reasoning* of the majority here. "High temperature" alloys and lubricants may well be inoperative or "useless" at low temperatures. The usefulness of these inventions, however, is not to be tested by reference to one of *no* skill in the art; if that were so, probably many specifications would be found to be "deficient" because an assertion that the invention was useful as a "lubricant" or as an "alloy" would be "too general." Simply stated, the specification speaks *to those of ordinary skill in the art*, section 112, and not to laymen. Persons of ordinary skill in the alloy and lubricant art *know* how to use these inventions. *Once* given a disclosure of these inventions they can *experiment*, without the assistance of the inventor or someone of a like or higher level of skill, to ascertain *applications* and *uses*, for the inventions.

It seems to me that the majority confuses its own lack of knowledge concerning "steroids" with the requirements of the law. I see no legal basis for distinguishing between *steroids, alloys* and *lubricants* concerning assertions of use. The fact is that the majority, from *personal* observation, apparently is willing to *presume* and *believe* that alloys and lubricants are *useful*. Further, they apparently are willing to presume and believe that it would be obvious to them as to how such products would be used. But because the products here are steroids, they and many other chemical products are presumed "useless" because it is the personal belief of the majority that some "do not work." The majority has convinced itself that the "proper" test required by "law" is to require the applicant to prove that he is not claiming one of what they would term "useless" steroids. Chaos in the invention, development, and disclosure of inventions in the chemical arts is the only result I can see as flowing from the majority's reasoning. There is no record basis for indulging the presumptions of the majority contrary to assertions in the specification, that appellants are trying to claim "one of those inactive steroids."

Here, as in *Joly*, I find that the majority misconstrues, misapprehends and misapplies *Manson*, all to the denial of due process to appellants. I therefore dissent.